UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES<br><br>    Plaintiff,<br><br>v.<br><br>DONTE MARK MOORE,<br><br>    Defendant. | Case No. 24-cr-00562-JSC-1<br><br>**ORDER RE: MOTION TO SUPPRESS**<br><br>Re: Dkt. No. 25 |

Pending before the Court is Donte Moore's motion to suppress, which was argued on April 23, 2025. (Dkt. No. 38.) Because Mr. Moore's papers articulated contested issues of fact "with sufficient definiteness, clarity, and specificity," the Court ordered an evidentiary hearing, *see United States v. Howell*, 231 F.3d 615, 620 (9th Cir. 2000), which was held on June 23, 2025. (Dkt. No. 54.) Having considered the parties' briefing, including supplemental briefing, and the evidence presented at the hearing, the Court DENIES Mr. Moore's motion to suppress. The investigatory stop of Mr. Moore was supported by reasonable suspicion of criminal activity.

## FINDINGS OF FACT[1]

Andre Taylor and Kenneth Anderson are San Francisco Police Department ("SFPD") officers assigned to the Crime Gun Investigations Center ("CGIC"). (Dkt. No. 30-1 at 4, 10.)[2] "CGIC is a specialized investigative unit within SFPD that focuses on combatting firearm-related crime in San Francisco." (*Id.* at 4, 10.) "Its members obtain extensive experience with, and

---

[1] To the extent any findings of fact are included in the Conclusions of Law section, they shall be deemed findings of fact, and to the extent any conclusions of law are included in the Findings of Fact section, they shall be deemed conclusions of law.

[2] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the documents.

1    on-the-job training regarding, the recognition and identification of firearms and firearm
2    accessories." (*Id.* at 4, 10.)

3          On October 7, 2024, Officer Taylor and Officer Anderson were driving in an unmarked
4    vehicle in a plainclothes capacity to "collect video evidence for an unrelated matter as part of
5    [their] CGIC duties." (*Id.* at 5, 11.) It was a sunny, clear day. (Dkt. No. 58 at 67; Dkt. No. 30-1
6    at 5, 11.) Officer Taylor was driving, and Officer Anderson was in the front passenger seat. (*Id.*
7    at 5, 11.) At approximately 12:30 p.m., traveling northbound on Taylor Street, they approached a
8    red light at the intersection of Eddy and Taylor Streets. (*Id.* at 5, 11; Dkt. No. 26-1 at 2.) Their
9    vehicle was the first in their lane (Dkt. No. 30-1 at 5, 11), so there were no cars between their
10   vehicle and the south-side crosswalk going west to east on Eddy Street. (Dkt. No. 58 at 67; Dkt.
11   No. 30-1 at 5, 11.)

12         While stopped at the red light, Officer Anderson noticed an individual, later identified as
13   Mr. Moore, riding a motorized scooter wearing a black hooded sweatshirt and black shorts riding
14   eastbound on Eddy Street. (Dkt. No. 30-1 at 11; Dkt. No. 26-2 at 5.) Officer Taylor saw Officer
15   Anderson's attention drawn to something, so Officer Taylor looked left and he too "observed a
16   male on a scooter riding eastbound . . . near the south crosswalk." (Dkt. No. 58 at 67; Dkt. No.
17   26-1 at 2.) Officer Taylor "could see a heavy object in [Mr. Moore's] front . . . hooded pocket,
18   and it appeared to have like an L-shape to it." (Dkt. No. 58 at 67.) When Mr. Moore was directly
19   in front of the vehicle, Officer Taylor "could see the extended magazine, a high-capacity magazine
20   sticking out of the pocket." (*Id.*) Officer Anderson also observed the magazine. (Dkt. No. 26-2 at
21   5 ("While [Mr. Moore] was passing us, we both observed a firearm magazine protruding from his
22   front pocket of his hoodie").) Based on their observations, training, and experience, Officer
23   Taylor and Officer Anderson believed Mr. Moore was carrying a firearm with a high-capacity
24   magazine. (Dkt. No. 26-1 at 2; Dkt. No. 26-2 at 5.)

25         The officers—neither of whom had seen Mr. Moore before—followed Mr. Moore to
26   "maintain[] observations of him to see what he was doing." (Dkt. No. 58 at 63, 68.) They drove
27   past Mr. Moore, who was stopped on the sidewalk of Eddy Street between Taylor and Mason
28   Streets, and made a loop around the block, ending up back at the intersection of Taylor and Eddy

United States District Court
Northern District of California

Street where they had seen Mr. Moore initially. (*Id.* at 68-69.) There, they saw Mr. Moore ride his scooter westbound on Eddy Street and followed him. (*Id.* at 69.) Because Mr. Moore turned against traffic on Jones Street, a one-way street, the officers lost sight of him while they turned onto Leavenworth then Ellis Street. (Dkt. No. 30-1 at 7; Dkt. No. 58 at 69-70.) Driving east on Ellis Street, the officers observed Mr. Moore standing near a Toyota van. (*Id.*)

They parked the vehicle and Officer Anderson approached Mr. Moore on foot. (Dkt. No. 58 at 71.) Officer Anderson told Mr. Moore to stop and asked whether Mr. Moore had a weapon on him. (*Id.* at 20, 122.) Mr. Moore said he wasn't on probation, and he started to backpedal away from Officer Anderson. (*Id.* at 20, 58; Dkt. No. 26-3, Ex. C at 1:00-1:01 ("Surveillance Footage from 441 Ellis Street").) Mr. Moore turned his back to Officer Anderson to step off the curb. (*Id.* at 1:02.) Mr. Moore continued to walk away from Officer Anderson. (*Id.* at 1:04.) Officer Taylor approached from across the street and the two officers tackled Mr. Moore to the ground. (*Id.* at 1:04-1:18.) After Mr. Moore was handcuffed, Officer Taylor pulled the firearm out of Mr. Moore's hoodie pocket. (Dkt. No. 26-3, Ex. D at 1:30 ("Taylor Bodyworn Camera").) Specifically, from the left side of Mr. Moore's pocket, Officer Taylor pulled the gun out, barrel-side first. (*Id.* at 1:30-36.)

The firearm and magazine Mr. Moore was carrying are black. (Dkt. No. 60-5 at 2.) The barrel-side of the firearm is approximately nine inches in length. (*Id.*) The magazine-side of the firearm is approximately nine inches in length, too. (Dkt. No. 60-6 at 2.) The magazine was loaded, (Dkt. No. 58 at 27; Dkt. No. 60-2 at 2), which increases its weight. (Dkt. No. 58 at 28.)

**LEGAL STANDARD**

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "Because warrantless searches and seizures are *per se* unreasonable, the government bears the burden of showing that a warrantless search or seizure falls within an exception to the Fourth Amendment's warrant requirement." *United States v. Cervantes*, 703 F.3d 1135, 1141 (9th Cir. 2012). For "brief investigatory stops of persons . . . that fall short of traditional arrest," "the Fourth Amendment is satisfied if the officer's action is supported by reasonable suspicion to

3

believe that criminal activity may be afoot." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (citing *Terry v. Ohio*, 392 U.S. 1, 30 (1968)). So called *Terry* stops "permit a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime." *Terry*, 392 U.S. at 27; *see also United States v. Brignoni-Ponce*, 422 U.S. 873, 881 (1975) ("The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur.").

The reasonable-suspicion standard required to conduct a *Terry* stop "is not a particularly high threshold to reach." *United States v. Valdes-Vega*, 738 F.3d 1074, 1078 (9th Cir. 2013). It "is a commonsense, nontechnical conception that deals with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Id.* (cleaned up). While "a mere hunch is insufficient to justify a stop, the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." *Arvizu*, 534 U.S. at 274 (cleaned up). The Court looks at the "totality of the circumstances" "to see whether the detaining officer[s] ha[d] a particularized and objective basis for suspecting legal wrongdoing." *Id.* at 273 (cleaned up). "This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *Id.* (cleaned up).

## MOTION IN LIMINE

Mr. Moore filed a motion in limine "seek[ing] to cross-examine . . . Officers Kenneth Anderson and Andre Taylor[] about their prior misconduct and the sustained findings that resulted therefrom." (Dkt. No. 46-1.) While the government did not oppose cross-examination on this issue, it "oppose[d] the Defendant introducing extrinsic evidence of the same." (Dkt. No. 48-1 at 1.) At the outset of the evidentiary hearing, for the reasons stated on the record, the Court granted Mr. Moore's request to question the officers about the prior sustained misconduct findings but denied Mr. Moore's request to call Department of Police Accountability witnesses to testify about

4

1   those findings and corresponding reports.

**CONCLUSIONS OF LAW**

**I.   SEIZURE**

Mr. Moore was seized when Officer Anderson approached him on the sidewalk at Ellis Street. Officer Anderson wore "a tactical police vest adorned with an SFPD star." (Dkt. No. 30-1 at 11.) Officer Anderson testified he "told Mr. Moore that I was going to stop him and detain him." (Dkt. No. 58 at 20.) At this point, then, Mr. Moore was seized within the meaning of the Fourth Amendment. Upon receiving an instruction from a police officer to stop, "a reasonable person would not feel free to disregard the police and go about his business" *See Fla. v. Bostick*, 501 U.S. 429, 434 (1991) (cleaned up); *see also Terry*, 392 U.S. 1 at 16 ("whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person"). So, pursuant to *Terry*, this seizure required reasonable suspicion.

**II.   REASONABLE SUSPICION**

Considering the totality of circumstances, the seizure of Mr. Moore was supported by reasonable suspicion. Officer Anderson and Officer Taylor saw a high-capacity magazine in Mr. Moore's pocket, and they saw an L-shaped bulge in that same pocket. The officers, who possess "extensive experience . . . regarding, recognition and identification of firearms," thus believed Mr. Moore was concealing a firearm. (Dkt. No. 30-1 at 10, *id.* at 12 (Officer Anderson testifying "Based on the shape, apparent weight of the object, and spatial relation of a large-capacity firearm magazine in relation to the object, I believed that Moore was concealing a firearm on his person"); *id.* at 6 (Officer Taylor testifying to the same).) Mr. Moore was in the Tenderloin, a high-crime area. (Dkt. No. 30-1 at 5, 11.) These facts together form the basis for reasonable suspicion. The Court elaborates on each below.

**A.   Observation of Magazine and L-Shaped Bulge**

There is a dispute as to whether the officers saw the magazine and/or the L-shaped bulge in Mr. Moore's pocket when he rode by them on Eddy Street. On this point, the Court finds the

officers' testimony credible.[3]  Officer Anderson testified when he saw Mr. Moore riding his scooter, the pocket of Mr. Moore's hoodie had an L-shape, and "[b]ased on the weight and the magazine protruding from his hoodie pocket, I believed that he was possibly concealing a firearm on his person."  (Dkt. No. 58 at 18-19.)  Officer Taylor testified as follows:

> [W]hile I was looking at [Mr. Moore], I could see a heavy object in his front hoodie – hooded pocket, and it appeared to have like an L-shape to it. And as he rode right in front of my vehicle, I could see the extended magazine, a high-capacity magazine sticking out of the pocket.

(Dkt. No. 58 at 67.)

The officers' testimony they saw a magazine and what they believed to be a firearm in Mr. Moore's pocket is consistent with other evidence in the record.  First, in the defense exhibit depicting an individual approximately the same height as Mr. Moore wearing the same brand and size of hoodie Mr. Moore was wearing with an airsoft gun in the pocket outfitted to replicate the weight of the gun Mr. Moore carried, there is an L-shaped bulge toward the center of the hoodie pocket.  (Dkt. No. 60-9.)  The picture thus depicts what the officers testified they observed: an L-shaped bulge in Mr. Moore's pocket.  Second, Mr. Moore testified that when Officer Anderson approached him on Ellis Street, Officer Anderson "asked me[] if I had a weapon on me."  (Dkt. No. 58 at 122; Dkt. No. 58 at 20 ("Q. Did you express any belief you had about why you wanted to stop [Mr. Moore]? [Officer Anderson]: I believe I told him -- I believe I stated that he was armed with a firearm.").)  Officer Anderson inquiring about a weapon at the outset of the interaction supports the Court's finding Officer Anderson previously observed the magazine and a bulge resembling a firearm.  Third, when Mr. Moore was detained in the police vehicle, Mr. Moore said someone must have told the officers, to which Officer Taylor responded "No man, you rode right in front of us with a gun."  (Taylor Bodyworn Camera at 5:40-5:47.)  So, Officer Taylor's explanation to Mr. Moore right after the incident is consistent with his testimony in court.

---

[3] At the evidentiary hearing, Mr. Moore questioned the officers about prior sustained findings of misconduct.  The Court concludes the previous sustained misconduct findings involved circumstances of a different nature and do not bear on the credibility of the officers' testimony in this case.

6

Finally, Officer Taylor testified Mr. Moore first passed in front of their car traveling eastbound (Dkt. No. 58 at 67), which means the magazine Officer Taylor testified to seeing would have been protruding from the right side of Mr. Moore's hoodie pocket.  After handcuffing Mr. Moore, as Officer Taylor pulled the gun out of Mr. Moore's pocket, the barrel was on the left side.  (Taylor Bodyworn Camera at 1:30-36.)  So, the positioning of the gun in Mr. Moore's pocket is consistent with Officer Taylor's testimony about observing the magazine.

At the evidentiary hearing, Mr. Moore offered several videos of a person wearing a black hoodie riding a scooter with replica guns in the pocket to support his argument that "the officers' claims about clearly seeing an identifiable gun in Mr. Moore's pocket . . . fly in the face of common sense."  (Dkt. No. 25 at 16.)  However, in none of those videos was a magazine sticking out of the hoodie pocket.  (Dkt. No. 58 at 148.)  The Court credits the officers' testimony they observed the magazine, which would support their belief Mr. Moore was carrying a firearm and not an iPhone or a U-Lock—alternatives Mr. Moore offered at the hearing.  Although Mr. Moore offered contradictory testimony on this point—testifying that no part of the gun or magazine was sticking out of his pocket while he was riding his scooter (Dkt. No. 58 at 118)—Mr. Moore also testified he was riding his scooter between 20 to 25 miles per hour.  (*Id.* at 117.)  While it may be true the magazine was not sticking out of Mr. Moore's pocket when he started riding the scooter, it is possible the position of the gun shifted during the ride.

At the evidentiary hearing, there was conflicting testimony about where the officers initially observed Mr. Moore riding his scooter.  Officer Anderson testified Mr. Moore was, like them, traveling northbound on Taylor Street and stopped next to their vehicle at the red light. (Dkt. No. 58 at 18-19.)  Officer Taylor testified Mr. Moore passed in front of their vehicle riding eastbound on Eddy Street.  (Dkt. No. 58 at 66-67.)  The Court finds—consistent with Mr. Moore's testimony, Officer Taylor's testimony, and Officer Taylor and Officer Anderson's police reports— that Mr. Moore was traveling eastbound on Eddy Street.  While at the evidentiary hearing Officer Anderson testified to something different, his police report—written soon after the event—stated Mr. Moore was riding eastbound on Eddy Street.  (Dkt. No. 26-2 at 5.)

        **1.**     **Significance of Observing Concealed Firearm**

Mr. Moore argues even if the officers identified a firearm in Mr. Moore's hoodie pocket, the presence of a concealed firearm does not establish reasonable suspicion under California's "shall issue" gun licensing regime. As Mr. Moore observes, previously, "carrying a concealed (not to mention loaded) weapon in California . . . [was] presumptively a crime." *United States v. Bontemps*, 977 F.3d 909, 914 (9th Cir. 2020). Thus, "a bulge that appear[ed] to be a concealed firearm [could] form the basis for a *Terry* stop." *Id.* at 915. But in 2022, following the Supreme Court's decision in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022), California changed its laws to become a "shall issue" licensing regime. Cal. Penal Code § 26150; *see United States v. Shepherd*, No. 2:24-CR-00083-DJC-1, 2024 WL 4120234, at *5 (E.D. Cal. Sept. 9, 2024) ("[F]ollowing the decision in *Bruen*, California first stopped enforcing the 'good cause' provision of its licensing scheme that was similar to the New York scheme at issue in *Bruen*, and then amended the law to require that a concealed permit 'shall issue' to applicants who meet certain criteria." (citing Cal. Dep't of Justice, *Legal Alert*, OAG-2022-02 (June 24, 2022))). In a "shall issue state," "local law enforcement *must* issue a concealed weapons license if the applicant meets certain qualifications." *United States v. Brown*, 925 F.3d 1150, 1154 (9th Cir. 2019). Given this shift, Mr. Moore argues *Bontemps* and other Ninth Circuit cases about reasonable suspicion, issued when California was a "may issue" regime, are unpersuasive; instead, "the precedent the Ninth Circuit developed in relationship to Washington cases binds this Court because both Washington and California are now 'shall issue' regimes." (Dkt. No. 32 at 7.)

But the two Ninth Circuit Washington cases Mr. Moore cites support the Court's conclusion the officers in this case had reasonable suspicion. *See Brown*, 925 F.3d 1150; *United States v. Willy*, 40 F.4th 1074 (9th Cir. 2022). In *Brown*, the police received a call from a YWCA employee in Seattle's Belltown neighborhood reporting "an unidentified resident at the YWCA claimed 'they saw someone with a gun.'" 925 F.3d at 1152. The resident provided a physical description of the man, and officers spotted the defendant, who matched the description from the 911 call. *Id.* The officers drove behind the defendant for several blocks before turning on their patrol lights, at which point the defendant started running. *Id.* The officers chased the defendant on foot, forced him to the ground at gunpoint, handcuffed him, and found a firearm and drugs. *Id.*

8

at 1152-53.  The defendant moved to suppress evidence from the searches.  Conducting a totality of the circumstances analysis, the Ninth Circuit concluded the officers did not have reasonable suspicion of criminal activity.  "[T]he lack of facts indicating criminal activity or a known high crime area dr[ove] [the court's] conclusion." *Id.* at 1153.  Because "it is presumptively lawful to carry a gun" in Washington, "the anonymous tip that [the defendant] had a gun thus created at most a very weak inference that he was unlawfully carrying the gun without a license." *Id.* at 1154.

*Brown* is distinguishable on several grounds.  First, whereas *Brown* involved an anonymous tip that a man was carrying a gun, this case is based on Officer Anderson and Officer Taylor's personal observations.  That is, in *Brown* there was "no evidence that . . . the officers observe[d] [the defendant] holding something or walking in a particular way that would corroborate the information that he might be carrying a gun." *Id.* at 1156.  Here, in contrast, two officers trained in firearm identification saw Mr. Moore carrying what appeared to be a firearm with a high-capacity magazine.  Second, in *Brown* "[t]here [was] no evidence that [the defendant] was in an area known for unlawful gun possession," and the government did not argue Belltown was "a 'high crime' area." *Id.* at 1156.  The *Brown* court underscored the significance of this factor, stating "[t]he lack of facts indicating criminal activity or *a known high crime area* drives our conclusion." *Id.* at 1153 (emphasis added).  Here, in contrast, the officers saw Mr. Moore carrying a magazine and what appeared to be a gun in San Francisco's Tenderloin neighborhood, which, as discussed below, is a high-crime area.  Mr. Moore's location thus drives the Court to reach a different conclusion than the *Brown* court regarding reasonable suspicion.

In *Willy,* the other Ninth Circuit Washington case Mr. Moore cites, two separate witnesses reported seeing the defendant with a gun.  40 F.4th at 1077-78.  The first witness stated the defendant pulled up outside his home, displayed a firearm, "and began talking about being abducted." *Id.* at 1077.  The second witness reported the defendant "told her that he had been kidnapped" and while they were talking, "told her he was armed and they displayed a pistol and put it away." *Id.* at 1078.  An officer located the defendant's truck at a gas station and, with his firearm drawn, ordered the defendant out of the vehicle, removed the gun holstered on the

9

1  defendant's hip, and escorted him in the backseat of his police vehicle. *Id.* at 1078. The Ninth
2  Circuit considered whether the officer had reasonable suspicion to conduct this investigatory stop
3  and whether the officer had probable cause to make the subsequent arrest. As to the former
4  inquiry, the Ninth Circuit concluded the officer "had reasonable suspicion to stop [the defendant]
5  and make further inquiries." *Id.* at 1089. While in Washington, a "shall issue" open carry state,
6  "[t]he bare fact that [the defendant] displayed a weapon would not be sufficient to stop [the
7  defendant]," the officer "had reasonable suspicion to detain [the defendant] to inquire further
8  whether his unusual interactions with the reporting parties amounted to a criminal violation or
9  were an indication that he was about to commit a crime." *Id.* at 1080, 1089.

10  Pursuant to *Willy*, openly carrying a gun in a "shall issue" state—by itself—does not
11  provide reasonable suspicion to justify a *Terry* stop. But *Willy* instructs that carrying a gun plus
12  another factor can provide reasonable suspicion. In *Willy*, the additional factor was the
13  defendant's "unusual interactions" with the witnesses, in which the defendant told the witnesses
14  "he had been kidnapped and held in a camouflaged trailer or van in the area and that he was trying
15  to find it." *Id.* at 1078. In this case, the additional factor is the high-crime area.

16  Moreover, the reasonable suspicion inquiry considers the officers' "own experience and
17  specialized training." *See Arvizu*, 534 U.S. at 274. Officer Taylor testified "in the hundreds of
18  firearm arrests and investigations in which I have been involved, I cannot recall once encountering
19  a suspect or arrestee who had a permit to carry a concealed firearm." (Dkt. No. 30-1 at 6.) And
20  Officer Anderson testified "in the hundreds of firearm arrests and investigations in which I have
21  been involved, I approximate just one instance in which the suspect or arrestee had a concealed
22  carry permit." (*Id.* at 12.) The fact that just one individual had a permit to carry a concealed
23  firearm in the hundreds of firearm arrests Officer Taylor and Officer Anderson have cumulatively
24  conducted further supports the reasonableness of the officers' belief Mr. Moore did not lawfully
25  possess the firearm concealed in his pocket.

26  **2.    Significance of Observing a High-Capacity Magazine**
27  That said, Mr. Moore's carrying a high-capacity magazine does not, alone, provide
28  reasonable suspicion. In 2025, the Ninth Circuit upheld California's ban on large-capacity

10

1   magazines. *Duncan v. Bonta*, 133 F.4th 852 (9th Cir. 2025); *see* Cal. Penal Code § 32310(c)

2   (penalizing "any person in this state who possesses any large-capacity magazine, regardless of the

3   date the magazine was acquired"). The government thus argues "[t]he sighting of the large-

4   capacity magazine by itself was sufficient reason alone to believe that 'criminal activity [was]

5   afoot.'" (Dkt. No. 30 at 14.) The Court disagrees, because the government's assertion disregards

6   the state of the law in October 2024 when Mr. Moore was arrested.

7   In September 2023, a district court declared section 32310 "unconstitutional in its entirety"

8   and enjoined its enforcement. *Duncan v. Bonta*, 695 F. Supp. 3d 1206, 1254 (S.D. Cal. 2023). As

9   such, individuals could not be penalized for possessing large-capacity magazines. "Rob Bonta,

10  the Attorney General of California, filed an emergency motion for a partial stay pending appeal."

11  *Duncan v. Bonta*, 83 F.4th 803, 805 (9th Cir. 2023). He sought to stay "all portions of the order

12  except those regarding Sections 32310(c) and (d), which relate to large-capacity magazines that

13  were acquired and possessed lawfully prior to the district court's order granting a permanent

14  injunction." *Id.* The Ninth Circuit granted Mr. Bonta's motion. *Id.* The effect of this partial stay,

15  then, was an individual could not be penalized for possession of large capacity magazines acquired

16  and possessed lawfully prior to the district court's order granting a permanent injunction. Mr.

17  Moore points out this "limitation made any enforcement of [section 32310(c)] nearly impossible,

18  as it would require the police to have evidence of exactly when and how a person acquired a large-

19  capacity magazine" and "[i]n the absence of such proof, the police could not arrest or charge

20  someone with a violation of § 32310(c)." The Court agrees. There is no evidence Officer

21  Anderson and Officer Taylor knew or had reason to believe Mr. Moore acquired the large-capacity

22  magazine they saw after the *Duncan* district court issued the injunction—nor, in the Court's

23  understanding—could the officers possess such understanding. So, by itself, Mr. Moore's

24  possession of a high-capacity magazine does not provide reasonable suspicion to justify a *Terry*

25  stop. But, it is relevant to the totality of the circumstances analysis, as the high-capacity magazine

26  supported the officers' conclusion the L-shaped bulge they saw in Mr. Moore's pocket was a

27  firearm.

28

11

### B.   High-Crime Area

"[T]he fact that the stop occurred in a 'high crime area' [is] among the relevant contextual considerations in a *Terry* analysis." *Wardlow*, 528 U.S. at 124. While by itself, "an individual's presence in a high crime area is *not* enough to support reasonable, particularized suspicion that the individual in question has committed or is about to commit a crime," *United States v. Montero-Camargo*, 208 F.3d 1122, 1138 (9th Cir. 2000), "officers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation." *Wardlow*, 528 U.S. at 124. "The citing of an area as 'high-crime' requires careful examination by the court, because such a description, unless properly limited and factually based, can easily serve as a proxy for race or ethnicity." *Montero-Camargo*, 208 F.3d 1138.

Having "carefully examine[d] the testimony of police officers in [this] case[]," *see id*., the Court concludes the government's assertion the Tenderloin neighborhood in San Francisco is a high-crime area is supported by evidence. Officer Taylor's declaration states he "ha[s] worked in the Tenderloin neighborhood, where firearm-related, narcotics, and violent crime was in 2024, and remain, widespread." (Dkt. No. 30-1 at 5.) In October 2024, when the stop occurred, Officer Taylor was "very familiar with the general area of the Tenderloin neighborhood" and knew it "to be a high-crime area where individuals were often in illegal possession of firearms, narcotics sales, shootings, armed robberies, and other violent crime regularly took place, and where there occurred a significant proportion of San Francisco's firearm-related crime." (*Id.*) Officer Anderson's declaration states the same. (*Id.* at 11.) At the hearing, both officers testified their understanding of the Tenderloin's crime patterns come from not only their on-the-ground experience but through reading reports of other incidents from the Tenderloin as part of their CGIC duties. (Dkt. No. 58 at 15, 66.) Because the Tenderloin is a "specific, circumscribed location[] where particular crimes occur with unusual regularity," *see Montero-Camargo*, 208 F.3d at 1138, the fact Mr. Moore was in the Tenderloin supports the reasonable suspicion inquiry here.

Mr. Moore's citation to *United States v. Conerly*, 75 F. Supp. 3d 1154, 1165 (N.D. Cal. 2014) does not persuade the Court otherwise. There, the court concluded the officer's "subjective

12

impression of the character of the neighborhood [was] not supported by objective indicia of frequent criminal activity that one would expect to find in such an area." The defendant challenged such "subjective impression" by producing evidence "there were just thirteen arrests for the sale of narcotics within a six block radius surrounding the [relevant] intersection in the last year." *Id.* In this case, Mr. Moore did not provide evidence rebutting Officer Anderson and Officer Taylor's testimony that the Tenderloin is a high-crime area. While the government bears the burden on a motion to suppress, the government met that burden by presenting the evidence described above, which Mr. Moore did not rebut.

### C. Totality of the Circumstances

In sum, considering the totality of circumstances, reasonable suspicion supported the *Terry* stop in this case. By itself, Mr. Moore's presence in a high-crime area would be insufficient for reasonable suspicion. And because California is a "shall issue" state, the L-shaped bulge in Mr. Moore's hoodie pocket would be insufficient by itself. The same applies to the high-capacity magazine the officers observed since Mr. Moore's arrest occurred before the Ninth Circuit affirmed the ban on high-capacity magazines. But these facts taken together, considered in light of the officers' training and experience, provided "a particularized and objective basis for suspecting legal wrongdoing."[4] *See Arvizu*, 534 U.S. 266 at 273 (cleaned up). As Officer Taylor testified, he believed Mr. Moore did not lawfully possess the gun "based on the fact [the gun] was seated inside of [Mr. Moore's] hooded pocket, along with a high-capacity magazine, and he had a hooded sweatshirt on on a sunny day, riding through a high-crime neighborhood." (Dkt. No. 58 at 71.) Likewise, Officer Anderson testified "[b]ased on the presence of the large-capacity magazine, the high-crime nature of the Tenderloin[5], the way in which Moore appeared to be

---

[4] At the hearing, the government argued any mistake the officers made about what they saw in Mr. Moore's pocket was a reasonable mistake of fact. (Dkt. No. 58 at 169.) Because the government had not raised this argument in its papers, the parties stipulated to further briefing. In its supplemental brief, the government states "[b]ecause the officers did not make a mistake in their observations, the Court actually need not consider the alternative argument that if the officers were mistaken, such was a reasonable mistake of fact." (Dkt. No. 59 at 2.) Mr. Moore's post-hearing brief observes the government "largely abandoned" the reasonable mistake of fact argument. (Dkt. No. 62 at 2.) So, the Court does not address this issue.

[5] At the evidentiary hearing, Officer Anderson stated the geographic location where he observed Mr. Moore carrying a gun was not a factor in his determination that Mr. Moore was carrying the

13

concealing the firearm, and my training and experience, I believed he was doing so unlawfully." (Dkt. No. 30-1 at 12.)

Moreover, "nothing in the initial stages of the encounter serve[d] to dispel [the officers'] reasonable fear for [their] own or others' safety." *See Terry*, 392 U.S. at 30. When Officer Anderson approached Mr. Moore and inquired about his having a firearm, Mr. Moore volunteered that he was not on probation and began to backpedal. He stepped off a curb then continued to walk away from Officer Anderson. (Surveillance Footage from 441 Ellis Street at 1:01-1:04.) Regardless of whether this constitutes flight—which the parties dispute—it was inconsistent with Officer Anderson's experience contacting someone with a concealed carry permit. (Dkt. No. 58 at 20 ("[T]hey usually tell you right away and comply with like your orders.").) Thus, pursuant to *Terry*, the officers were entitled for the protection of themselves and others "to conduct a carefully limited search of the outer clothing of [Mr. Moore] in an attempt to discover weapons which might be used to assault [them]." *See* 392 U.S. at 30. "Such a search is a reasonable search under the Fourth Amendment, and any weapons seized may properly be introduced in evidence against the person from whom they were taken." *Id.* at 31. So, the Court DENIES Mr. Moore's motion to suppress.

## CONCLUSION

For the reasons stated above, the Court DENIES Mr. Moore's motion to suppress.

This Order disposes of Docket No. 25.

**IT IS SO ORDERED.**

Dated: July 28, 2025

JACQUELINE SCOTT CORLEY
United States District Judge

---

gun unlawfully. (Dkt. No. 58 at 62.) The Court does not credit this testimony and instead credits Officer Anderson's declaration on this point.